UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| SOUTH CAROLINA DEMOCRATIC PARTY; DCCC; and DSCC,<br><br>                     Plaintiffs,<br><br>    v.<br><br>MARCI ANDINO, in her official capacity as Executive Director of the South Carolina State Election Commission; JOHN WELLS, in his official capacity as Chair of the South Carolina State Election Commission; and CLIFFORD J. EDLER, HAROLD E. FAUST, and SCOTT MOSELEY, in their official capacities as members of the South Carolina State Election Commission,<br><br>                     Defendants. | Case No. _____<br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs the South Carolina Democratic Party, DCCC, and DSCC, by and through the undersigned attorneys, file this Complaint for Declaratory and Injunctive Relief against Defendants Marci Andino, John Wells, Clifford J. Edler, Harold E. Faust, and Scott Moseley in their official capacities, and upon information and belief allege as follows:

## INTRODUCTION

1.     Organizations that work to increase the number of registered voters fulfill a vital role in our democratic society when they run and fund voter registration drives. That work is crucial to ensure that eligible citizens who might not be aware of or otherwise come into contact with other means by which they may register to vote, are not denied their right to participate in the electoral process as a result. Voter registration drives are particularly necessary in South Carolina, where, historically, the means of registration exclusively offered by the State itself have not been sufficient to reach significant numbers of its eligible citizens. In 2018, the South Carolina Election Commission estimated that approximately 950,000 eligible South Carolina residents were not

registered to vote. "To put that in perspective, just over 1.2 million people total voted in the 2014 election for Governor."[1]

2.     At issue in this case is a provision in South Carolina law that makes the work of registering eligible voters by entities and individuals who conduct voter registration drives needlessly, and unlawfully, burdensome. Specifically, South Carolina is in the extreme minority of states that require potential voters to disclose their full nine-digit social security number ("SSN") on their voter registration applications. *See* S.C. Code Ann. §§ 7-5-170(2), 7-5-185(B)(5). Any application that does not include a potential voter's full SSN will be rejected and the person will not be permitted to vote. S.C. Code Ann. § 7-5-155(a)(3) (requiring that "any application[s]" with any incomplete sections "be rejected").

3.     As a direct result, organizations that work to register voters in South Carolina must overcome wholly unjustifiable and often significant obstacles every time they attempt to register a voter. In an age when legitimate concerns about identity theft are widespread and growing among the American populace, those engaged in voter registration drives must convince each potential voter to provide their full SSN to a stranger, to be then turned over to an elections administration system that has publicly acknowledged that it is being targeted by and is uniquely vulnerable to cyber attackers. Indeed, both the federal government and the State of South Carolina advise citizens against disclosing their full SSNs to unknown individuals.

4.     If that were not problematic enough, the full SSN requirement means that persons and entities who engage in voter registration drives also open themselves up to serious legal jeopardy should they themselves be the target of a data breach, or otherwise inadvertently expose the SSNs that they must collect. For the same reason, it is difficult to find vendors who will assist in voter registration efforts in South Carolina, who are often themselves unwilling to take on the serious risk of legal exposure that results specifically from South Carolina's full SSN requirement.

---

[1] *Election Commission: Nearly 1 million eligible South Carolinians not registered to vote*, ABC NEWS 4 (Oct. 8, 2018), https://abcnews4.com/news/local/election-commission-nearly-1-million-eligible-south-carolinians-not-registered-to-vote.

At best, these issues slow the pace at which organizations can conduct voter registration and make voter registration activities more costly. At worst, they make undertaking voter registration activities so burdensome as to nearly inhibit the activity wholesale.

5.    What makes South Carolina's full SSN disclosure requirement especially pernicious is that it is wholly unnecessary with respect to preventing voter fraud or maintaining accurate voter lists. Nearly all of the other states (and the District of Columbia) use some other identifier besides a full SSN to register voters and maintain lists of eligible voters.

6.    South Carolina's full SSN disclosure requirement is an unconstitutional burden on the voting process and the First and Fourteenth Amendment speech and associational rights of organizations that run and fund voter registration efforts in South Carolina, including Plaintiffs the South Carolina Democratic Party, DCCC, and DSCC. In addition, South Carolina's full SSN disclosure requirement violates the Civil Rights Act.

## PARTIES

7.    The South Carolina Democratic Party (the "Party") brings this action on its own behalf and on behalf of its members who participate in and financially support the Party's voter registration efforts. The Party is a political party within the meaning of S.C. Code Ann. § 7-11-12 and is the South Carolina state party committee of the national Democratic Party. The Party is dedicated to promoting the message of the Democratic Party within South Carolina and has members in every county in the state. South Carolina's full SSN disclosure requirement directly harms the Party by impeding its efforts to register new voters and encouraging those voters to support Democratic candidates. The full SSN disclosure requirement also harms the Party by decreasing the pool of registered voters who could identify with and join the Democratic Party in South Carolina and by decreasing the total number of votes for Democratic candidates within the state.

8.    Plaintiff DCCC is the national congressional committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). DCCC's mission is to elect Democratic candidates to the U.S. House of Representatives from across the United States, including from South Carolina's seven

3

congressional districts. DCCC works to accomplish its mission by, among other things, funding voter registration drives and assisting state parties throughout the country, including in South Carolina. In 2018, DCCC made contributions and expenditures in the millions of dollars to register voters and persuade and mobilize those registered voters to support Democratic congressional candidates. DCCC intends to again expend significant resources to support Democratic candidates in 2020, including specifically in South Carolina. The state's full SSN disclosure requirement directly harms DCCC because it frustrates its mission and efforts to register voters and persuade and mobilize those voters to elect Democratic candidates in South Carolina. It also necessarily reduces the pool of eligible voters who can vote for Democratic candidates. Most immediately, DCCC will have to expend and divert additional funds and resources on get out the vote ("GOTV"), voter persuasion efforts, and other activities in South Carolina, at the expense of its efforts in other states, in order to combat the effects of South Carolina's full SSN disclosure requirement.

9.     Plaintiff DSCC is the national senatorial committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party to the U.S. Senate, including in and from South Carolina. DSCC works to accomplish its mission by, among other things, funding voter registration drives and making expenditures for and contributions to Democratic candidates for U.S. Senate and assisting state parties throughout the country, including in South Carolina. In 2018, DSCC made contributions and expenditures in the tens of millions of dollars to register voters and persuade and mobilize voters to support Democratic Senate candidates. In 2020, there will be a Senate election in South Carolina, and DSCC will work to elect the Democratic candidate. As a result, DSCC again intends to make substantial contributions and expenditures to support the Democratic candidate for U.S. Senate in South Carolina in 2020. South Carolina's full SSN disclosure requirement directly harms DSCC because it frustrates its mission and efforts by reducing the pool of eligible voters who can vote for the Democratic candidate for U.S. Senate from South Carolina. Most immediately, DSCC will have to expend and divert additional funds and resources on GOTV, voter persuasion efforts, and

other activities in South Carolina, at the expense of its efforts in other states, to combat the effects of South Carolina's full SSN disclosure requirement in the 2020 general election for U.S. Senate in South Carolina.

10.     Defendant Marci Andino is the Executive Director of the South Carolina Election Commission and is sued in her official capacity. The Executive Director is the Chief Administrative Officer for the State Election Commission and is required by law to supervise the County Boards of Voter Registration and Elections. S.C. Code Ann. § 7-3-20. In this role, she is tasked with ensuring that those County Boards comply with state and federal law in conducting elections and voter registration. *Id*. § 7-3-20(C). In addition, as Executive Director, she is also tasked with maintaining an official statewide voter registration database and removing those persons from the list who are not qualified to vote. *Id*.

11.     Defendant John Wells is the Chair of the South Carolina Election Commission and is sued in his official capacity. Defendants Clifford J. Edler, Harold E. Faust, and Scott Mosley are members of the South Carolina Election Commission and are sued in their official capacities. The Executive Director serves at the pleasure of the South Carolina Election Commission, S.C. Code Ann. § 7-3-20(A), and the enumerated mission of the Commission is, in relevant part, to ensure that every eligible citizen has the opportunity to register to vote.

## JURISDICTION AND VENUE

12.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

13.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

14.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities only.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

16.    This Court has the authority to enter declaratory and injunctive relief under Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## STATEMENT OF FACTS AND LAW

**A.    South Carolina's full SSN disclosure requirement is an extreme outlier among the fifty states' voter-registration requirements.**

17.    South Carolina law requires individuals to disclose their full, nine-digit SSN to register to vote. *See* S.C. Code Ann. §§ 7-5-170(2), 7-5-185(5). This SSN disclosure requirement applies to every method of voter registration, including both electronic and paper applications. *See id.*

18.    If a potential voter submits a voter application form that does not include their full nine-digit SSN, that application will be rejected, and the person will not be registered to nor able to vote.

19.    Accordingly, South Carolina's voter registration form directs applicants to list their full, nine-digit SSN at the top of the voter registration form and indicates such information is required by South Carolina law.

20.    This full SSN disclosure requirement is a true outlier—South Carolina is one of only a handful of states that require individuals to disclose their full SSN to register to vote.

21.    In fact, longstanding federal privacy law prohibits almost every other state in the country from denying otherwise eligible voters the right to register and vote because they refuse to disclose their full SSN.

22.    Specifically, the Privacy Act of 1974 (the "Privacy Act"), Pub. L. No. 93–579, 88 Stat. 1896, 1909, (contained as amended in 5 U.S.C. 552a (note)), prohibits any federal, state, or local government agent from "deny[ing] to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number."

23.    But the Privacy Act also includes a "grandfather" provision which permitted a state to evade the Act's requirements if that state (1) maintained a system of records before 1975, and (2) required the disclosure of an individual's SSN to verify an individual's identity under that

system of records. *Id.* (allowing such an exception only if disclosure of the full SSN was "disclosure was required under statute or regulation adopted [before January 1, 1975] to verify the identity of an individual").

24.    South Carolina is one of a handful of states that qualified for the Privacy Act's grandfather provision for voter registration provisions in 1975.

25.    Since then, Hawai'i has voluntarily rescinded its requirement that voters provide their full SSN to register. Accordingly, South Carolina is one of only four states that will reject voter registration applications that do not contain full SSNs.[2]

**B.    Serious privacy and identity theft concerns justify individuals' unwillingness to disclose their SSNs.**

26.    When Congress passed the Privacy Act more than four decades ago, it recognized the sensitivity of individuals' personally identifiable information, such as one's SSN, and the need to protect that information. *See* S. Rep. No. 93-1183, *reprinted in* 1974 U.S.C.C.A.N. 6916, 6943 (identifying the widespread use of SSNs in the public and private sectors "one of the most serious manifestations of privacy concerns in the Nation").

27.    Over the past four decades, the privacy interest in one's SSN has grown exponentially, as have the risks associated with its unauthorized exposure, due in no small part to the fact that, in the modern era, so much of our personal and professional lives are conducted online.

28.    More than a decade ago, this Court took judicial notice "that identity theft is an increasing worldwide problem." *Cox v. City of Charleston, S.C.*, 250 F. Supp. 2d 582, 591 (D.S.C.

_____

[2] The U.S. Election Assistance Commission guidance for completing the National Voter Registration Application identifies five states—South Carolina, Tennessee, Virginia, New Mexico, and Kentucky—that "require" the full SSN to be registered to vote.  U.S. Election Assistance Commission, Register To Vote In Your State By Using This Postcard Form and Guide ("National Voter Form Instructions"), https://www.eac.gov/assets/1/6/Federal_Voter-_Registration_ENG.pdf. New Mexico, however, requires a full SSN only for online registrations. N.M. Stat. Ann. § 1-4-5.4. Although Kentucky requests the full SSN, it does not reject voter applications on that basis. Ky. Rev. Stat. § 116.155 ("The registration form shall include the voter's . . . Social Security number" but "[n]o person shall be denied the right to register because of the failure to include his Social Security number.").

2003) (Norton, J.) (striking down parade ordinance requirement to submit a full SSN as facially violative of the First Amendment), *aff'd*, 416 F.3d 281 (4th Cir. 2005).

29.     Today, when a person's full SSN is compromised, the consequences can be catastrophic, encompassing not only financial identity theft—which can in itself be ruinous—but also government identity theft, criminal identity theft, and medical identify theft.

30.     In other words, if unauthorized individuals gain access to a full SSN, the immediate potential for mayhem is nearly limitless—the victims become vulnerable to the perpetrators stealing their tax refunds, collecting their benefits and income, obtaining credit and loans in their name, using their health insurance, even exposing the victims themselves to prosecution for the crimes of the thieves.

31.     Undoing the harm caused by a malevolent actor armed with one's full SSN can be nearly impossible. For better or worse, Americans' identities are increasingly tied to those nine digits, making them among some of the most important, and potentially vulnerable, personal data that each American has.

32.     Today U.S. citizens are becoming increasingly aware of the danger in sharing their SSN. In 2014, respondents to a poll by the Pew Research Center overwhelmingly rated their SSN as more sensitive information than even information about the state of their health and the medicine they take, the content of their phone conversations, text messages, and emails, their birth date, their internet search history, or their political views and the candidates they support.

33.     Both the federal government and South Carolina itself strongly advise Americans against giving out their SSN unless absolutely necessary, and never to someone unknown.

34.     This advice is not news to anyone who has been paying attention. Over the past several decades, Americans have been increasingly unwilling to share their SSN with others.

35.     In the early 1990s, for example, about 60% of respondents to the General Social Survey were willing to provide their full SSN to the survey. But by 2010, only about 20% of respondents were willing to provide such information to interviewers.[3]

36.     The reticence to sharing SSNs has become so widespread that even government agencies have faced significant obstacles to collecting individuals' information when that information is tied to sharing a SSN.

37.     The Census Bureau, for example, used to ask for a full SSN in its interviews. But as the Social Security Administration explains, over the past few decades, "survey respondents [to the Census] have become increasingly reluctant to provide their SSNs to survey data collectors" because of their perceived "opportunity to commit identity theft."[4]

38.     Over time, response rates to the Census dropped so dramatically that the Census, "[r]eacting to [the] expanding SSN nonresponse problem," was forced to drop the requirement altogether to ensure the Census's overall data would not be compromised by lower response rates. *Id*.

## C.     The increasing reticence of Americans to share their full SSN is exacerbated in the voter registration context by highly publicized concerns about the security of elections databases.

39.     U.S. citizens' increased awareness of identity theft concerns and hesitation to share their SSNs has found additional justification in recent government disclosures highlighting state elections systems' vulnerability to hacking breaches or insufficient security measures.

---

[3] Jibum Kim, et. al, *Trends and Correlates of Consenting to Provide Social Security Numbers*, 27 FIELD METHODS 348 (2015).

[4] For example, respondents refusing to provide SSNs to census interviewers increased from 12% to 35% between 1996 and 2004. *See* Jennifer McNabb et al., *Uses of Administrative Data at the Social Security Administration*, 69 SOCIAL SECURITY BULLETIN 1, https://www.ssa.gov/policy/docs/ssb/v69n1/v69n1p75.html.

40.     Recently, the United States Senate Intelligence Committee concluded that foreign state actors attempted to infiltrate the elections systems of all 50 states in advance of the 2016 presidential election.[5]

41.     In at least 21 states, hackers attempted to gain access to voter registration databases—each of which typically contains personally identifiable information, including the partial or full SSN, of that state's voters. In at least two of those states, the hackers successfully gained access to the state's voter registration database. In Illinois, for example, hackers gained access to hundreds of thousands of partial SSNs from those voters' registration records.[6]

42.     In light of the attacks on state election systems leading up to the 2016 presidential election, the Senate Intelligence Committee now broadly considers state voter registration databases to be highly vulnerable to attack.[7]

43.     South Carolina is no exception. According to the South Carolina Election Commission, hackers attempted to infiltrate the state's voter registration database nearly 150,000 times on Election Day in 2016.[8]

44.     U.S. officials expect even more attacks in advance of the 2020 elections.[9]

45.     Beyond foreign state interference, state voter registration systems are broadly vulnerable to being accessed by unauthorized third parties. Breaches in state voter registration databases can occur for a wealth of reasons, including domestic hacking, as well as inadvertent

---

[5] United States Senate, Report of the Select Comm. on Intelligence, 116th Cong., Rep. on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election Volume 1: Russian Efforts Against Election Infrastructure with Additional Views (2019), https://www.intelligence.senate.gov/sites/default/files/documents/Report_Volume1.pdf.
[6] *Id*. at 22.
[7] *Id*. at 57.
[8] Alexa Corse, *South Carolina May Prove a Microcosm of U.S. Election Hacking Efforts*, WALL ST. J. (July 16, 2017), https://www.wsj.com/articles/south-carolina-may-prove-a-microcosm-of-u-s-election-hacking-efforts-1500202806?mod=e2twp.
[9] US Officials Fear Ransomware Attack Against 2020 Election, CNBC (Aug. 26, 2019), https://www.cnbc.com/2019/08/26/us-officials-fear-ransomware-attack-against-2020-election.html.

loss or theft of personal electronic or storage devices, simple administrative error, or abuse of network privileges.

46.     These vulnerabilities are especially disconcerting in the context of South Carolina's election systems because of South Carolina's outlier use of the full, nine-digit SSN for voter registration.

47.     Unlike a data breach in a state that utilizes only the last four digits of a SSN or some other identifying number, a data breach in South Carolina exposes registered voters to identity theft almost instantaneously.

48.     Despite these concerns, South Carolina has failed to take sufficient measures to protect its state election systems. Just last year, the U.S. House Committee on Administration rated South Carolina as one of the top five most vulnerable states for election security.[10]

49.     This past year, in an effort to respond to this problem, the South Carolina Election Commission requested millions of dollars in funding from the South Carolina General Assembly to shore up its election security measures and protect voter data.

50.     Although the General Assembly ultimately provided some funding, South Carolina election officials said that it was not enough to make the election security changes that they considered necessary before the 2020 election.[11]

51.     It is against this backdrop of an increased risk of identity theft and an acknowledged failure of South Carolina's government to take adequate measures to secure election data—including voter registration information—that organizations such as Plaintiffs that wish to conduct voter registration drives must ask individuals to share their full SSNs in order to advance their mission.

---

[10] United States House of Representatives, Comm. on House Administration, Election Security Update: Top 18 Most Vulnerable States (July 2018).

[11] Bristow Marchant, *SC Will Need a Lot More Money to Secure Its Elections*, THE STATE (May 11, 2018), https://www.thestate.com/news/politics-government/article210613149.html.

**D.     South Carolina's full SSN disclosure requirement inhibits voter registration.**

52.     It is axiomatic that to win an election, a political party must convince voters to turn out and vote for their preferred candidates. But even the most persuasive campaign in the world is limited in its ability to succeed if the pool of registered voters is unjustifiably limited by overly burdensome hurdles to voter registration.

53.     Historically, South Carolina has had strikingly high numbers of residents who, although eligible to vote, have not registered to do so. In October of 2018, the South Carolina Election Commission estimated the number of eligible but unregistered South Carolinians was close to 1 million citizens. Thus, it is clear that the voter registration provisions in place have been inadequate to reach conspicuously large numbers of South Carolina's eligible populace, all of whom are excluded from the electorate.

54.     Voter registration drives are necessary to bridge this demonstrated gap, including in particular to reach pockets of voters in communities who often are underserved by the methods of voter registration offered directly by the state or its agencies.

55.     Research shows that voter registration drives demonstrably increase the number of voters who register and participate in an election—that is, voter registration drives reach voters who would not have registered but for that personal contact from a volunteer or campaign.[12]

56.     This is why it is no answer to say that the difficulties that the full SSN requirement pose for voter registration drives is of no import, because, for example, South Carolina allows for direct online registration.

57.     Not all potential voters in South Carolina can simply go online to register. In fact, a substantial percentage of South Carolina residents lack even basic internet service.[13] Additionally, to be eligible to register to vote online in South Carolina, you must have a valid South Carolina

---

[12] *See* David W. Nickerson, *Do Voter Registration Drives Increase Participation? For Whom and For When?*, 77 THE JOURNAL OF POLITICS, 1, 88 (2015).

[13] Tom Barton, *Lagging Internet Left Rural South Carolina Biz Stranded. Lawmakers Seek to Fix "Digital Divide,"* GREENVILLE NEWS (Mar. 11, 2019), https://www.greenvilleonline.com/story/news/2019/03/11/south-carolina-seeks-fix-digital-divide-boost-rural-internet-speed/3131109002/.

driver's license or other identification card issued by South Carolina's Department of Motor Vehicles. *See* S.C. Code Ann. § 7-5-185.

58. Low-income individuals, young individuals, and recent transplants to South Carolina—individuals who are generally most likely to not to be registered to vote in the first place—are among the populations most likely to lack such an ID, or to have the face-to-face interactions with the state offices that themselves are authorized to register voters.

59. Many populations thus substantially rely on traditional voter registration drives—and the corresponding in-person interaction with a political volunteer or canvasser—to register to vote. Black voters, for example, are twice as likely to rely on a voter registration drive to register to vote than white voters are.[14]

60. Political parties have long been among the wide variety of organizations that have worked hard to assist in registering eligible South Carolina citizens to vote through third-party voter registration drives.

61. Sometimes these efforts are door-to-door activities, and other times they are part of larger community events. In all cases, South Carolina's full SSN disclosure requirement necessarily requires volunteers and canvassers to attempt to convince strangers to entrust them with their full, nine-digit SSN. In light of the increased awareness and legitimate concerns about identity theft and elections security, that ask has become increasingly difficult to make.

62. Unsurprisingly, a large number of potential voters are simply unwilling to give their SSN to a stranger conducting a voter registration drive. And for good reason—even if the chance that that volunteer will use their SSN for nefarious reasons is low, many potential voters simply conclude that risk—either that they are unlucky to hand that sensitive information to a bad actor, or that it later becomes vulnerable in an attack on South Carolina's elections administration—is not one worth taking.

---

[14] *See* CENSUS BUREAU, *Voting and Registration in the Election of November 2016, Table 12: Method of Registration by Selected Characteristics* (May 2017), https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html.

63.     The difficulties presented by South Carolina's full SSN disclosure requirement do not end when a volunteer or canvasser successfully convinces a potential voter to hand over their full SSN to a complete stranger.  Instead, that volunteer or canvasser, or their associated organization, has a brand-new problem—namely, the potential legal liability associated with collecting, maintaining, and transmitting individuals' social security numbers.

64.     DCCC in particular, had significant difficulty finding a third-party vendor that would agree to conduct voter registration activities in the state and accept any degree of liability for its staff collecting registration forms with the SSN. South Carolina's full SSN disclosure requirement has effectively transformed voter registration drives from a time-honored civic tradition to a legal and administrative nightmare.

65.     Between that corresponding legal liability and individuals' increasing unwillingness to share their SSNs with others, South Carolina's full SSN disclosure requirement creates an onerous burden on voter registration activities within the state.

**E.     South Carolina's full SSN disclosure requirement is wholly unnecessary.**

66.     Presumably, South Carolina requires applicants to provide their SSN when they register to vote to assist the state in identifying and verifying those applicants' eligibility to vote. But a full SSN is wholly unnecessary to this identification and verification process.

67.     When Congress passed the Help America Vote Act, Pub. L. No. 107–252, Title III, § 302, 116 Stat. 1706 (codified at 42 U.S.C. § 15301 et seq.) ("HAVA"), in 2002, it recognized that states must be able to verify applicants' eligibility to vote before adding them to the state's voter registration rolls. To do so, Congress instructed states to confirm an applicant's eligibility to vote with that individual's driver's license number, or, if that number was unavailable, the *last four digits* of that individual's SSN. In passing HAVA, Congress thus concluded that a full SSN was not necessary to verify an individual's eligibility to vote.

68.     Today, the overwhelming majority of states and the District of Columbia successfully verify applicants' eligibility to vote with some identifying number besides a person's full SSN.

69.     Because South Carolina's full SSN disclosure requirement is unnecessary and inhibits voter registration activities—and, therefore, voter participation—Plaintiffs ask the Court to (1) declare that the full SSN disclosure requirement is unconstitutional and violates the Civil Rights Act; (2) enjoin Defendants from enforcing South Carolina's full SSN disclosure requirement; and (3) order Defendants to change immediately South Carolina's voter registration system, form, and associated literature to use the last four digits of a SSN or some other identifying number in place of the full SSN.

## CAUSES OF ACTION

### COUNT I
### First Amendment
### U.S. Const. Amend. I; 42 U.S.C. §§ 1983, 1988; 28 U.S.C. §§ 2201, 2202
### Freedom of Speech and Association

70.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

71.     Voter registration drives implicate expressive and associational rights of the parties who engage in voter registration.

72.     The First Amendment requires vigilance "to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 192 (1999). The Supreme Court has applied "exacting scrutiny" to review laws governing election-related speech. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995); *see also League of Women Voters v. Hargett*, No. 19-cv-00385, 2019 WL 4342972, at *8 (M.D. Tenn. Sept. 12, 2019) ("[L]aws that govern the political process surrounding elections—and, in particular, election-related speech and association—go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'") (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)). The Supreme Court has found restrictions on such speech unconstitutional when they "significantly inhibit" election-related speech and

association and were "not warranted by the state interests . . . alleged to justify [the] restrictions." *Buckley,* 525 U.S. at 192.

73.    South Carolina's full SSN disclosure requirement makes it more difficult for Plaintiffs, when conducting voter registration campaigns in South Carolina, to fulfill their purpose of engaging with potential voters and encouraging them to register and vote. Accordingly, South Carolina's full SSN disclosure requirement violates Plaintiffs' First Amendment rights in at least two independent ways: by (1) chilling the protected expressive speech that occurs during voter registration; and (2) making it more difficult for Plaintiffs to associate with others for the advancement of common beliefs through running and funding voter registration drives.

74.    At its most fundamental level, a voter registration drive involves "encourag[ing] . . . citizens to register to vote." *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 698 (N.D. Ohio 2006). "[E]ncouraging others to register to vote" is "pure speech." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012). And because that speech is "political in nature," "it is a core First Amendment activity." *Hargett*, 2019 WL 4342972, at *8 (quotation marks omitted). Like circulating an initiative petition for signatures, registering voters is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 422-23 (1988).

75.    South Carolina's full SSN disclosure requirement chills Plaintiffs' political speech in two distinct ways. First, because organizations that run and fund voter registration drives, such as Plaintiffs, face potential legal liability associated with collecting, maintaining, and transmitting individuals' SSNs, the disclosure requirement impedes Plaintiffs' ability to conduct voter registration activities in the state. At a minimum, Plaintiffs must implement complex administrative procedures to ensure that individuals' SSNs are not compromised if they choose to conduct voter registration activities. Because of the disclosure requirement, Plaintiffs also struggle to find volunteers who are willing to participate in voter registration activities because doing so requires those volunteers to ask potential voters to provide highly personal and sensitive information about themselves. Some volunteers are uncomfortable requesting and possessing this

sensitive information, while others may be discouraged from participating fully in voter registration drives because of potential voters' unwillingness to disclose their full SSNs. The SSN disclosure requirement thus unconstitutionally "limits the number of voices" available to convey Plaintiffs' message and ultimately "limits the size of the audience they can reach." *Meyer*, 486 U.S. at 422–23.

76.    Second, even when Plaintiffs manage to conduct voter registration activities despite the SSN disclosure requirement, that requirement hinders Plaintiffs' political speech because its volunteers and canvassers are not able to effectively register new voters. Because many potential voters are, understandably, simply unwilling to provide their full SSN to a stranger, Plaintiffs' voter registration activities are necessarily stifled and limited by the SSN disclosure requirement.

77.    The SSN disclosure requirement also violates Plaintiffs' freedom of association. "[O]rganizing between individuals in support of registration efforts involves political association that is, itself, protected under the First Amendment." *Hargett*, 2019 WL 4342972, at *8. "Where groups, formal or informal, seek to advance their goals through the electoral process, regulations preventing their members from [participating in voter registration] impair their ability effectively to organize and make their voices heard." *Hernandez v. Woodard*, 714 F. Supp. 963, 973 (N.D. Ill. 1989) (citing *Rhode Island Minority Caucus, Inc. v. Baronian*, 590 F.2d 372, 376–77 (1st Cir. 1979)).

78.    The SSN disclosure requirement first violates Plaintiffs' freedom of association by limiting the number of volunteers and canvassers who can conduct voter registration activities within the state. Because South Carolina's SSN disclosure requirement necessarily makes participating in voter registration activities more burdensome, Plaintiffs have fewer volunteers and canvassers who are able to register voters. Fewer volunteers and canvassers means Plaintiffs have fewer voices communicating their message about the importance of participating in the democratic process and fewer hands registering voters and affecting political change.

79.    The SSN disclosure requirement also violates Plaintiffs' freedom of association by depressing the pool of registered voters who could identify with and join the Democratic Party in

South Carolina. Even though all potential voters will not ultimately register to vote, and even though many potential voters who do not register to vote will not ultimately support Democratic causes and candidates, a significant number would likely support Democratic candidates and causes based on demographic data and voting trends.

80.    "'Laws that burden political speech' are [] generally subject to strict scrutiny." *Fusaro v. Cogan*, 930 F.3d 241, 248–49 (4th Cir. 2019) (citing *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)). To survive strict scrutiny, the law must be necessary to serve a compelling state interest and narrowly drawn to achieve that end. *See id.* at 248. Similarly, laws that inhibit "the right to associate for expressive purposes" may only be justified by "compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

81.    South Carolina has, no doubt, a legitimate state interest in maintaining accurate voter lists. But the SSN disclosure requirement is far from the least restrictive means of achieving that state interest. When Congress passed HAVA in 2002, it instructed states to confirm an applicant's eligibility to vote with that individual's driver's license number, or, if that number was unavailable, the *last four digits* of that individual's SSN. In passing HAVA, Congress thus concluded that a full SSN was not necessary to verify an individual's eligibility to vote. Today, the overwhelming majority of states and the District of Columbia successfully verify applicants' eligibility to vote with some identifying number besides a person's full SSN. South Carolina's full SSN disclosure requirement is thus simply not the least restrictive means to maintaining accurate voter registration lists. And "if the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973).

82.    Nor can South Carolina's full SSN disclosure requirement be justified by administrative ease. While it may be marginally easier for South Carolina to continue its current SSN disclosure requirement than it would be to identify voters through the last four digits of a

SSN or some other identifying number, Plaintiffs' rights of speech and association are significantly chilled by the full SSN requirement and concerns of "administrative convenience" cannot justify the deprivation of those constitutional rights. *Taylor v. Louisiana*, 419 U.S. 522, 535 (1975).

## COUNT II
### First and Fourteenth Amendments
### U.S. Const. Amend. I and XIV; 42 U.S.C. §§ 1983, 1988; 28 U.S.C. §§ 2201, 2202
### Undue Burden on Core Political Speech, Associational, and Voting Rights

83.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

84.    A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the State for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

85.    The *Anderson-Burdick* inquiry utilizes a flexible sliding scale, where the rigorousness of scrutiny depends upon the extent to which the challenged law burdens First and Fourteenth Amendment rights. *See Fusaro v. Cogan*, 930 F.3d 241, 257 (4th Cir. 2019). Severe burdens trigger strict scrutiny and must be supported by compelling state interests. *See id*. Slight burdens must also "be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd*., 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted).

86.    South Carolina's full SSN disclosure requirement imposes a severe burden on Plaintiffs' fundamental rights of speech and association, as well as its members' and constituencies' voting rights, and the full SSN disclosure requirement is not narrowly tailored to address a compelling state interest.

87.    The full SSN disclosure requirement effectively denies the right to vote in South Carolina's elections entirely to persons who are unwilling to proffer their full SSN in exchange for the exercise of that right, conditioning their access to the electoral process on the degree to which

they are willing to chance being the next victims of identity theft, either because of mishandling in the registration process itself, or because South Carolina has failed to sufficiently secure its elections databases to adequately guard against the very real threat of a cyber-attack on those databases themselves.

88.     To the extent that South Carolina bases its continued use of the full SSN disclosure requirement on maintaining accurate voter lists and verifying the identities of potential voters, less burdensome, equally effective alternative methods exist to accomplish that end, such as the use of the last 4 digits of the SSN.

89.     In addition, even if the burden imposed by South Carolina's full SSN disclosure requirement is not severe, South Carolina's interest in maintaining accurate voter lists and confirming the identity of potential voters does not outweigh the burden that the requirement imposes on fundamental rights of Plaintiffs and their membership, by effectively excluding entirely from the electorate those voters who do not supply their full SSN when registering to vote.

90.     Thus, the burdens South Carolina's full SSN disclosure requirement imposes on the fundamental right to vote outweigh substantially any benefits South Carolina enjoys from the requirement's existence and enforcement and must be found unconstitutional under the *Anderson-Burdick* test.

## COUNT III
### 52 U.S.C. § 10101(a)(2)(B), 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202
### Civil Rights Act Materiality Claim

91.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

92.     The Civil Rights Act provides, in relevant part, that "[n]o person . . . shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any . . . registration, . . . if such error or omission is not *material* in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B) (emphasis added).

20

93.     This federal statute was "intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga. 2018) (quotation marks omitted).  In *Martin*, for instance, the court held that the plaintiffs had a substantial likelihood of prevailing on their Civil Rights Act Materiality Claim because "a voter's ability to correctly recite his or her year of birth on the absentee ballot envelope [was] not material to determining said voter's qualifications under Georgia law." *Id.* at 1308–09.

94.     Under South Carolina law, individuals who meet the following six criteria are eligible to vote: (1) be a U.S. citizen; (2) be at least 18 years old or so before the next election; (3) be a resident of South Carolina; (4) not be declared mentally incompetent; (5) not be in prison stemming from a conviction; and (6) not been convicted of a felony or an election law crime or if previously convicted, be done serving the sentence, including probation and parole.[15]

95.     Whether an individual has disclosed their full SSN is unrelated to any of the six eligibility requirements and is, therefore, immaterial to whether they are eligible to vote in South Carolina.  But despite this fact, South Carolina mandates that applicants include their full SSN and rejects any voter registration application that does not include the full SSN. S.C. Code Ann. § 7-5-155(a)(3) (requiring that "any application[s]" with any incomplete sections "be rejected").

96.     Potential voters whose voter registration applications are denied or not processed because they do not contain complete SSNs are denied the right to vote for reasons immaterial to their qualifications to vote.

---

[15] See the corresponding state constitutional provisions and statutes for the six identified requirements: (1) S.C. Const., art. II, § 4; S.C. Code Ann. § 7-5-120(A); (2) S.C. Const., art. II, § 4; S.C. Code Ann. § 7-5-120(A)(1); (3) S.C. Code Ann. § 7-5-120(A); (4) S.C. Code Ann. § 7-5-120(B)(1); (5) S.C. Const., art. II, § 7; S.C. Code Ann. § 7-5-120(B)(2); and (6) S.C. Code Ann. § 7-5-120(B)(3).

97.     Similarly, potential voters who elect not to register to vote solely because South Carolina requires a full SSN number to complete registration are denied the right to vote based on an issue immaterial to their eligibility to vote.

98.     Plaintiffs bring this claim on their own behalf as well as on behalf of their members who are denied the right to vote based on an issue immaterial to their eligibility and qualifications to vote.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and:

A.     Declare, under the authority granted to this Court by 28 U.S.C. § 2201, that South Carolina's full SSN disclosure requirement for voter registration violates the First and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act;

B.     Preliminarily and permanently enjoin Defendants and their agents, officers, employees, and all persons acting in concert with any of them from enforcing the full SSN disclosure requirement;

C.     Order Defendants to immediately implement an updated voter registration system (including voter registration database, voter registration forms, and instructions regarding voter registration) that utilizes an alternative to the full SSN for voter identification and all future voter registration activities;

D.     Award Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988, 52 U.S.C. § 10310(e), and other applicable laws; and

E.     Grant Plaintiffs such other and further relief as the Court deems necessary.

Dated this 25th day of November, 2019.

Respectfully submitted,

/s/ Christopher J. Bryant

Marc E. Elias*
Elisabeth C. Frost*
Christopher J. Bryant, Federal ID 12538
Christina A. Ford*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
efrost@perkinscoie.com
cbryant@perkinscoie.com
christinaford@perkinscoie.com

*Counsel for the Plaintiffs*
*\* Pro Hac Vice Applications*
*Forthcoming*